**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| BRIDGEPORT HEALTH CARE REALTY CO., | : | Case No. 21-50521 (JAM) |
| | : | |
| Debtor. | : | |
| | : | |
| BRIDGEPORT HEALTH CARE REALTY CO., | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | |
| | : | |
| TAX COLLECTOR, CITY OF BRIDGEPORT, | : | |
| RTLF-CT, LLC, WATER POLLUTION | : | |
| CONTROL AUTHORITY, THE ACQUARION | : | |
| WATER COMPANY, PEOPLE'S BANK, | : | |
| N/K/A PEOPLE'S UNITED BANK, CARETECH | : | |
| SUPPLIES, INC., SUPERSONIC FUNDING and | : | |
| INTERNAL REVENUE SERVICE, | : | |
| | : | |
| Respondents. | : | |

**DEBTOR'S MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING
BIDDING PROCEDURES AND BIDDER PROTECTIONS IN CONNECTION
WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS,
(B) AUTHORIZING THE DEBTOR TO ENTER INTO PURCHASE AND
SALE AGREEMENT WITH STALKING HORSE BIDDER AND (C)
SCHEDULING A FINAL SALE HEARING AND APPROVING THE FORM
AND MANNER OF NOTICE THEREOF AND (II) AN ORDER (A)
AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTOR'S ASSETS FREE AND CLEAR OF ANY INTEREST IN SUCH
ASSETS AND (B) GRANTING CERTAIN RELATED RELIEF**

Bridgeport Health Care Realty Co. ("BHCR" or the "Debtor"), for its motion (the "Sale

Motion") pursuant to pursuant to sections 105 and 363 of Title 11 of the United States Code (the

"Bankruptcy Code"), Federal Rules of Bankruptcy Procedure 2002, 6004, 9007, 9008 and 9014,

and District of Connecticut Local Bankruptcy Rules 2002-1, 6004-1 and 6004-2, for the following

1

relief: (I) an order (a) approving bidding procedures and bidder protections in connection with the sale of substantially all of the Debtor's assets; (b) authorizing the Debtor to enter into the Amended and Restated Purchase and Sale Agreement ("PSA") made as of August 17, 2021, and appended hereto as **Exhibit A**; and (c) scheduling a final sale hearing and approving the form and manner of notice thereof; and (II) an order (a) authorizing the sale of substantially all of the Debtor's assets, free and clear of liens, claims, interests and encumbrances; and (b) granting certain related relief, respectfully state:

### Preliminary Statement

1.      The Debtor commenced this bankruptcy case under Chapter 11 to effectuate the sale (the "Sale") of its real estate known as 540 Bond Street a/k/a 600 Bond Street (collectively, "600 Bond Street"), and 735 Palisades Avenue, all situated in the City of Bridgeport, State of Connecticut, and all improvements and personal property situated thereon (the "Property") and thereby maximize the value received for the benefit of the Debtor's creditors in their order of priority. The proposed purchaser has agreed to purchase the Property in exchange for the payment of $5 million (subject to higher and better offers and this Court's approval as set forth herein).

2.      The proposed sale of the Property will result in the City of Bridgeport receiving in excess of $3 million on account of unpaid real estate taxes and other municipal authorities receiving in excess of a hundred thousand dollars.

3.      Moreover, the party with the greatest financial stake in maximizing value for the Property—the first, second and third mortgage holder, People's United Bank, National Association ("People's United")—will receive from the proceeds of the Sale in excess of $1 million dollars after nearly a decade of non-payment. People's United is presently owed by the

2

Debtor approximately $8.6 million. People's United consents to the relief requested by this Sale Motion and, in particular, the Sale.

4.      The proposed Sale also facilitates the rehabilitation and renovation of the currently vacant and boarded-up Property by either the proposed purchaser, Blue Garden Management, Inc. ("Blue Garden"), or, alternatively, by such other purchaser offering the highest and best bid approved by this Court.

5.      Since the aggregate amount of all debts secured by liens and other encumbrances against the Property exceed the value of the Property (by millions of dollars), those secured creditors who could not be paid in full from the sale proceeds would—outside of bankruptcy—need to voluntarily release their liens and encumbrances in order to effectuate its "short sale." The fourth mortgage holder—whose mortgage was not duly authorized and is facially invalid and "out of the money" by millions of dollars—refused to voluntarily release its mortgage as part of the contemplated "short sale" which necessitated this bankruptcy case to accomplish the Sale.

6.      For the past years, in the face of multiple foreclosure actions and the bankruptcy filing by and eventual closure of its tenant, Bridgeport Health Care Center, Inc. ("BHCC"), the Debtor explored alternative transactions before selecting the proposed purchaser to be the stalking horse, and the Debtor has negotiated the opportunity for higher and better offers to be made for the Property pursuant to the bidding procedures proposed herein. The stalking horse's proposed purchase price ($5,000,000) exceeds by almost $1 million the appraised value of the Property ($4,070,000) accepted and ultimately found by the Superior Court, State of Connecticut.

7.      The Debtor submits that the Sale proposed herein represents the best available

3

alternative for the Property at this time.

8.      For all of these reasons, the Debtor respectfully requests that this Court grant the relief requested by this Sale Motion.

## Venue and Jurisdiction

9.      This Court has jurisdiction to consider this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.

10.     Consideration of this Sale Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

11.     Venue is proper in this Court for these cases and this Sale Motion pursuant to 28 U.S.C. §§ 1408 and 1409, respectively.

12.     The basis for the relief requested herein is Bankruptcy Code §§ 105(a) and 363, Bankruptcy Rules 2002, 6004, 9007, 9008 and 9014, and Local Rules 2002-1, 6004-1 and 6004-2.

## Background

13.     On August 20, 2021 (the "Petition Date"), the Debtor commenced the above-captioned chapter 11 case (the "Chapter 11 Case") by filing its voluntary petition for relief under Chapter 11 the Bankruptcy Code.  Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtor continues to operate its business and manage its properties, affairs, and assets as debtor-in-possession.  No trustee or examiner has been appointed in this case.

14.     The Debtor owns the Property which consists of two distinct parcels, 600 Bond Street and 735 Palisade Avenue, both situated in Bridgeport, Connecticut.

15.     600 Bond Street consists of one large two-story structure formerly used as a nursing home, known as Bridgeport Manor, with a 240-bed capacity, and a second single-story

structure used for storage and to house the primary components of the mechanical systems (e.g., boilers). The subject buildings were built originally in 1930 and rehabbed and remodeled in various stages and to varying degrees in the following years. These two structures comprise 146,290 sq. ft. gross building area. The site consists in approximately 9.25 acres of land.

16.    735 Palisade Avenue is adjacent to 600 Bond Street and consists of one six-story structure formerly used as a nursing home, known as Bridgeport Health Care Center, with a 240-bed capacity. The subject building was built in 1971 and rehabbed and remodeled in various stages and to varying degrees in the following years. This building comprises 132,310 sq. ft. gross building area.  The site consists of approximately 5.64 acres of land.

17.    The Debtor acquired the Property on June 11, 1990. At the time, 600 Bond Street had been operated as Hillside Hospital, and 735 Palisade Avenue had been operated as the Dinan Memorial Center, a nursing home.

18.    BHCC was formed on March 4, 1990, to acquire and operate the nursing home located at 735 Palisade Avenue.

19.    Eventually, BHCC obtained approval and began to operate a separate nursing home at the 600 Bond Street property (known as Bridgeport Manor).

20.    BHCC leased the Property from the Debtor on a "triple-net" basis, meaning, BHCC was responsible to pay all expenses associated with the ownership, possession, and maintenance of the Property.

21.    Over the past decade, BHCC experienced significant financial challenges arising from its operation of the Bridgeport Health Care Center and Bridgeport Manor.

22.    On or about August 7, 2017, the Water Pollution Control Authority for the City of Bridgeport ("WPCA") commenced a civil action before the Superior Court in the State of

Connecticut (the "Superior Court") against the Debtor seeking to foreclose the municipal sewage system charges as well as all inchoate and recorded liens it held against the Property. The action is captioned <u>Water Pollution Control Authority for the City of Bridgeport v.</u> <u>Bridgeport Health Care Realty Co.</u>, docket number FBT-CV17-6065970 ("WPCA Foreclosure Action"), and is currently pending before the Superior Court in Bridgeport.

23.    On April 13, 2018, the Commissioner for the Department of Social Services, State of Connecticut (the "DSS" or the "State") filed his Complaint against BHCC seeking the imposition of a receivership.

24.    On April 18, 2018, BHCC filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut, New Haven Division. Simultaneously therewith, BHCC's affiliate, Rosegarden Health & Rehabilitation Center, LLC ("Rosegarden Health") that operated its own nursing home in Waterbury, Connecticut, filed its voluntary petition for bankruptcy relief under Chapter 11 before the New Haven Bankruptcy Court. BHCC's and Rosegarden Health's bankruptcy cases are jointly administered in <u>In re: The Rosegarden Health and Rehabilitation</u> <u>Center LLC, et al.</u>, Case No. 18-30623 (AMN).

25.    Shortly after the bankruptcy filings, on April 25, 2018, People's United filed a Motion to Appoint Trustee (the "Trustee Motion"). After an evidentiary hearing spanning several days, the Court, on May 15, 2018, entered an order granting the Trustee Motion.

26.    On May 17, 2018, and upon the Application for the Approval of Jon P. Newton, Esq. as Chapter 11 Trustee of the bankruptcy estates of Rosegarden Health and BHCC, the Court entered an order approving the appointment of the Trustee.

27.    On July 23, 2018, People's United commenced a civil action before the

Superior Court against the Debtor seeking to foreclose its mortgage against the Property. The action is captioned <u>People's United Bank, National Association v. Bridgeport Health Care Realty Co.</u>, docket number FBT-CV18-6076997-S, and is currently pending before the Superior Court in Bridgeport.

28.    On July 24, 2018, the bankruptcy court, upon the Trustee's motion and following an evidentiary hearing, entered an Order Authorizing Chapter 11 Trustee to Wind Down and Cease to Operate Bridgeport Manor and for Related Relief.

29.    Despite the closure of Bridgeport Manor and due, in part, to the inability to formally separate the two parcels, the Trustee continued to possess 600 Bond Street.[1]

30.    Later in 2018 and early in 2019, the Trustee explored the possibility of a sale of BHCC which also depended upon the simultaneous sale of the Property by the BHCR. The Trustee worked with People's United and BHCR to develop a mechanism to market and ultimately sell the nursing home facility (including the Property). Toward that end, the Trustee obtained bankruptcy court approval on April 26, 2019, to retain Senior Living Investment Brokerage ("Senior Living") to market the subject assets.

31.    The Trustee, working in concert with BHCR and People's United, also obtained bankruptcy court authority to commence a sales program for the facility (the "Sales Program"), subject to a specific timeline.

32.    In furtherance of the Sales Program, Senior Living, along with the other parties, worked in earnest, helping to identify persons interested in acquiring BHCC and the Property, preparing and circulating an offering memorandum, entering into confidentiality agreements

---

[1] Among other issues, significant portions of the mechanical systems needed to operate the Bridgeport Health Care Center, located on 735 Palisade Avenue, were physically situated on the 600 Bond Street property where Bridgeport Manor had formerly operated.

with interested persons, compiling due diligence materials, arranging tours for interested persons, and establishing a data room for due diligence.

33.     The Sales Program included a bid deadline of July 26, 2019.

34.     On or before the bid deadline, the Trustee received three (3) bids for the purchase of BHCC. The Trustee thereafter engaged in meetings and/or discussions, on several occasions over a number of months, with both the bid committee established as part of the Sales Program and the bidders themselves to discuss the offers, each of which had certain shortcomings.

35.     The field of bidders was eventually narrowed to one, whose offer seemed to meet most, if not all, of the State's requirements and was higher than the others, but not in an amount that proved sufficient to all those involved in the sales process. For example, during the sales process, the large magnitude of various expenses associated with the real estate, as well as the capital expenditures needed for a change of ownership of the facility, came into clear light, reducing, to a meaningful extent, the potential dollars available to the creditors of BHCC. For this and other reasons, the bid committee was unable, collectively, to recommend a potential buyer to the bankruptcy court.

36.     Accordingly, on October 18, 2019, the Trustee filed his Motion for Order Authorizing Trustee to Wind Down and Cease to Operate Bridgeport Health Care Center, Inc. and for Related Relief. The motion was met with objections from parties (including BHCR) seeking, *inter alia*, the continuation of discussions with the prospective buyer to reach an agreement on the sale of BHCC as a going concern. Ultimately, following multiple hearings over the course of months, the prospective purchaser withdrew its offer to acquire BHCC and the Property, various parties-in-interest withdrew their objections, and the bankruptcy court on

January 7, 2020, entered its Order Authorizing Trustee to Wind Down and Cease to Operate Bridgeport Health Care Center, Inc.

37.    In the following months, the Trustee wound down and ceased to operate BHCC.

38.    On April 14, 2020, the Trustee filed his Motion to Reject Unexpired Nonresidential Real Property Lease concerning BHCC's lease of the Property from BHCR.

39.    On May 8, 2020, the Trustee surrendered possession of the Property to BHCR.

40.    Shortly thereafter, the WPCA resumed prosecution of the WPCA Foreclosure Action.

41.    On February 8, 2021, the WPCA filed its Motion for Judgment of Strict Foreclosure. On February 24, 2021, People's United filed its Motion for Foreclosure by Sale.

42.    In connection with its Motion for Judgment of Strict Foreclosure in the WPCA Foreclosure Action, on April 8, 2021, the WPCA filed the Real Estate Appraisal Report setting forth the expert opinion of John Lo Monte Real Estate Appraisers & Consultants establishing the fair market value of 600 Bond Street to be $2,070,000.

43.    On April 13, 2021, the WPCA filed in the WPCA Foreclosure Action the Real Estate Appraisal Report setting forth the expert opinion of John Lo Monte Real Estate Appraisers & Consultants establishing the fair market value of 735 Palisade Avenue to be $2 million.

44.    On April 26, 2021, the Superior Court in the WPCA Foreclosure Action entered its Judgment of Foreclosure by Sale finding the fair market value of the Property to be $4,070,000 and establishing Saturday, October 23, 2021, at 12:00 pm, as the date and time for the foreclosure sale.

45.    During this time frame, the Debtor engaged in various efforts to sell the

Property. Specifically, on February 21, 2021, the Debtor entered into that Certain Open Listing Agreement with Brass Moon Realty. Brass Moon Realty then provided notice of the potential sale of the Property to its network of potential purchasers.

46.    Initially, two parties expressed an interest, conducted their own due diligence including inspecting the property, and eventually made offers to purchase the Property (all less than the current purchase price).

47.    A third interested party then became involved in discussions to purchase the Property.

48.    Then, Blue Garden entered discussions and made the highest offer thus far received, but with various contingencies (most significantly, zoning approval). In response, the Debtor's broker countered with a higher price and the request that the buyer drop the contingencies. Blue Garden held firm on its purchase price, $5 million, but eventually, after conducting further due diligence, agreed to waive various contingencies.

49.    Finally, Brass Moon Realty was approached by a separate group of investors. They toured the Property and conducted their own due diligence.  This group then decided not to make an offer.

50.    Thus, through this competitive sale process, Blue Garden submitted the highest and best bid in the amount of $5 million without any financing, property inspection, or governmental approval contingencies and with a prompt closing of October 22, 2021.

51.    Blue Garden holds no other connection to the Debtor, its partners and their respective members, its creditors, any other party in interest, their respective attorneys, accountants, the United States Trustee or any person employed in the office of the United States Trustee, in matters related to this Case and the Sale. Blue Garden may have connections with

certain creditors of the Debtor (e.g., Tax Collector, City of Bridgeport, the Water Pollution Control Authority, The Aquarion Water Company, People's United and the Internal Revenue Service), in matters completed unrelated to this Case and the Sale. After consummation of the Sale, assuming it is approved by this Court, Blue Garden anticipates that it will not have any legal relationship with the Debtor.

52.    The $5 million purchase price was both sufficient to satisfy all municipal charges and liens against the Property and acceptable to People's United to receive in exchange for its consent to release all its liens and other encumbrances against the Property.[2] The proposed purchase price is also nearly $1 million more than the appraised value of the Property.

53.    Time is of the essence. With each passing day, debts secured by the Property having priority over People's United's mortgage continue to accrue significantly. People's United's consent to the Sale is expressly conditioned upon a closing on or before October 30, 2021. The Debtor's agreement with Blue Garden also required an expedited sale process with a closing date of October 22, 2021. The Debtor's commitment to close on or before October 22, 2021, was a material inducement to Blue Garden to agree to the Sale and the sale process through this bankruptcy case to effectuate the Sale free and clear of liens, claims, interests and encumbrances.

54.    By this Sale Motion, pursuant to Bankruptcy Code sections 105 and 363 and Federal Rules of Bankruptcy Procedure 2002 and 6004, the Debtor hereby seek the following. First, at a hearing (the "Bidding Procedures Hearing") to be held as soon as practicable, the Debtor requests entry of an order substantially in the form of the Bidding Procedures Order attached hereto as **Exhibit B** setting for the various procedures by which the Sale shall be

---

[2] People's United is not releasing the Debtor from all other remaining obligations pursuant to the various loan documents entered into between them.

effectuated (the "Bidding Procedures") including, but not limited to, the required notice of the opportunity to bid, the bid deadline, and the auction (if necessary). Second, the Debtor requests that this Court schedule a hearing (the "Sale Hearing") on or before October 1, 2021, to consider approval of the sale of the Property to the Buyer or to any other Successful Bidder (as such term is defined in the Bidding Procedures). Third, upon conclusion of the Sale Hearing, the Debtor requests the entry of an order substantially in the form attached hereto as **Exhibit C** (the "Sale Order"), authorizing the sale of the Property (including all related personal property and fixtures) free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever.

### The Purchase and Sale Agreement

55.     The PSA is the product of arms-length negotiations between the Debtor and Blue Garden. Blue Garden has agreed to pay $5 million in exchange for the Property transferred free and clear of all liens, claims, interests and encumbrances.

56.     CREDITORS AND PARTIES IN INTEREST ARE URGED TO REVIEW THE PSA ANNEXED HERETO AS **EXHIBIT A** FOR FURTHER DETAILS CONCERNING THE PROPOSED SALE. DESCRIPTIONS OF THE PSA IN THIS MOTION ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH AGREEMENT ITSELF. Key provisions of the PSA include:

a.  Section 1.1 **Purchase**—the Property and all assets related to the Property to be transferred.
b.  Section 1.2 **Purchase Price**—$5 million in cash.
c.  Section 1.2(a) **Deposit**—$250,000 delivered to the escrow agent, Old Republic National Title Insurance.
d.  Section 1.3 **Conveyance**—warranty deed conveying good and marketable fee simple title to the Property free and clear of all liens, encumbrances, easements, restrictions and exceptions to title other than "Permitted Exceptions" or those set forth in Schedule 1.4.

e.  Section 4.1 **Condition of Premises**—Property sold "AS IS", "WHERE IS", HOW IS", and "WITH ALL FAULTS."

f.  Sections 4 and 5 **Seller's and Purchaser's Representations and Warranties**—customary representations, warranties and covenants in a transaction of this type.

g.  Section 7.1 **Dates**—Debtor to seek approval of the Bidding Procedures and the Sale within specified dates.

h.  Section 7.2 **Closing Date**—the closing date for the Sale shall take place on or before October 22, 2021.

i.  Sections 7.3 and 7.4 **Conditions Precedent to Seller's and Purchaser's Obligations**—customary conditions precedent for each respective party including, but not limited to, entry of the order approving the Sale no later than October 4, 2021.

j.  Section 7.5 **Failure of Purchaser's Condition Precedent**—providing that in the event the conditions precedent to purchaser's obligation to perform have not been met, purchaser may terminate the transaction and receive the return of the deposit.

k.  Section 11 **Break-up Fee**—providing Blue Garden with the protections of a break-up fee in the amount of $100,000.

### The Settlement Agreements

57.    On August 19, 2021, the Debtor and People's United entered into that certain Settlement Agreement appended hereto as **Exhibit D**. In summary, the Debtor and People's United agreed that People's United will accept the net proceeds of from the Sale of the Property realized in this bankruptcy case (based on its order of priority), paid on or before October 31, 2021, and, in exchange, consent to the relief requested in this Sale Motion and, in particular, the Sale, and, upon such closing and its receipt of the net proceeds, release any and all liens and other encumbrances against the Property. People's United further agreed to provide the Debtor's counsel with a "carve out" in the amount of $50,000 to facilitate this bankruptcy case and the Sale. THIS DESCRIPTION OF THIS SETTLEMENT AGREEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH AGREEMENT ITSELF.

58.    On August 4, 2021, the Debtor, the former partners of the Debtor who guaranteed the Debtor's obligations to People's United (the "Guarantors"), the current partners of the Debtor,

and People's United entered into that certain Settlement Agreement appended hereto as **Exhibit E**. In summary, the Guarantors agreed to pay such additional amount as may be necessary for People's United to receive (when combined with the net proceeds of the Sale of the Property paid to People's United) the total amount of $1,750,000 from the Sale of the Property. In exchange for the Guarantors' payment any such shortfall, People's United has agreed to release the Guarantors from any deficiency (and the Guarantors have provided their reciprocal release). THIS DESCRIPTION OF THIS SETTLEMENT AGREEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH AGREEMENT ITSELF.

59.    For the avoidance of doubt, the Debtor represents that the Sale proposed by this Sale Motion ***is not in any way conditioned upon*** the Guarantors' performance of their obligations pursuant to their Settlement Agreement with People's United.

## Nature of Liens and Interests Claimed Against the Property

60.    The City of Bridgeport, Tax Collector, is owed real estate taxes due against the Property, secured by recorded and inchoate liens, for the 2017, 2018, 2019 and 2020 Grand Lists. The Debtor estimates that such real estate taxes and other related amounts due shall total approximately $3,234,690.99 as of October 31, 2021 (this amount will be recalculated as of the actual closing date for the sale of the Property). RTLF-CT, LLC is currently the holder of the liens recorded with respect to the 2017 through 2019 Grand Lists and, upon information and belief, will, by the time of the closing of the Sale, be the holder of the liens recorded with respect to the 2020 Grand List. At this time based on the information the Debtor possesses, it does not dispute these liens and debts.

61.    The WPCA holds recorded and inchoate liens on account of sewer use charges and amounts due in connection therewith. On April 26, 2021, the Superior Court in the WPCA Foreclosure Action entered judgment of foreclosure by sale in favor of the WPCA as follows:

    a.  Foreclosure Sale Date: October 23, 2021;

    b.  Debt: $127,115.31;

    c.  Attorney Fees: $29,408.75;

    d.  Title Search Fee: $225.00;

    e.  Appraisal Fee: $2,700.00;

    f.  Bill of Costs: $1,067.92; and

    g.  Fair Market Value: $4,070,000.

The total amount of the judgment debt due the WPCA as of April 26, 2021, is $160,516.98. T At this time based on the information the Debtor possesses, it does not dispute these liens and debts.

62.    The Debtor may owe The Aquarion Water Company ("Aquarion") charges for water use secured by recorded and inchoate liens. The Debtor does not believe any balance is currently owed to Aquarion by the Debtor and Aquarion has so represented to the Debtor's counsel in writing.  However, there are currently unreleased liens against the Property recorded by Aquarion and, accordingly, the Debtor hereby discloses such circumstances. At this time based on the information the Debtor possesses, the Debtor disputes any secured amount claimed by Aquarion.

63.    People's United is owed secured balances on account of its three mortgages and various duly perfected security interests against the Property, for principal, interest, late charges and negative escrow balance, as follows:

| | | |
|---|---|---|
| a. | Outstanding Principal Balance of the First Mortgage: | $4,216,785.67 |
| b. | Interest on the First Mortgage computed at the applicable interest rate through August 19, 2021: | $1,192,937.79 |
| c. | Outstanding Principal Balance of the Second Mortgage: | $119,743.23 |
| d. | Interest on the Second Mortgage computed at the applicable interest rate through August 19, 2021: | $36,232.06 |
| e. | Outstanding Principal Balance of the Third Mortgage: | $2,195,181.42 |
| f. | Interest on the Third Mortgage computed at the applicable interest rate through August 19, 2021: | $643,334.23 |
| g. | Late Charges: | $171,406.14 |
| h. | Negative Escrow Balance: | $20,680.69 |

Thus, the total amount of the secured debt due People's United as of August 19, 2021, is $8,596,301.23, exclusive of all other charges that may arise under the documents evidencing these obligations including all costs of collection incurred in connection with such obligations by People's United, and the reasonable fees and expenses incurred by People's United's attorneys. The Debtor does not dispute these liens and debts.

64.    Caretech Supplies, Inc. ("Caretech") may claim an interest in the Property by virtue of that certain Mortgage Deed dated March 27, 2018, and recorded November 19, 2018, on the Bridgeport Land Records. The Debtor disputes the validity, priority and amount purportedly secured by the Mortgage Deed due to, *inter alia*, the following: (a) lack of consideration provided to BHCR since all amounts claimed allegedly arose from goods and/or services provided by Caretech to BHCR; (b) lack of due authority since BHCR did not authorize the Mortgage Deed; (c) lack of any legal description for the Property; and (d) the lack of the statutorily required two witnesses. *See* Conn. Gen. Stat. § 47-5(a). Moreover, Caretech's claimed debt and Mortgage Deed is subject to all prior liens, encumbrances and interests stated above which secure amounts that

exceed, by millions of dollars, the fair market value of the Property. The Debtor disputes this lien and debt claimed by Caretech.

65.     Supersonic Funding ("Supersonic") may claim an interest in the Property by virtue of a security interest in and UCC-1 Financing Statement recorded with the Secretary of State, State of Connecticut, on August 30, 2016, against essentially all personal property of the Debtor. The Debtor has been unable to determine what amount, if any, is due by the Debtor to Supersonic. Moreoever, Supersonic's claimed debt and security interest is subject to all prior liens, encumbrances and interests stated above which secure amounts that exceed, by millions of dollars, the fair market value of the personal property included within the Property.

66.     The Internal Revenue Service ("IRS") may claim an interest in the Property by virtue of that certain Notice of Federal Tax Lien dated September 6, 2017, and recorded September 26, 2017, on the Bridgeport Land Records. However, the tax lien asserts only a lien against the taxpayer identified as "Bridgeport Health Care Center Inc." and BHCC holds no interest in the Property proposed by this motion to be sold. Accordingly, the Debtor disputes any assertion by the IRS that it holds a lien and debt against the Property.

**Contemplated Administrative Expenses and Deductions from Proceeds of Sale**

67.     Assuming approved by this Court, the Debtor contemplates paying all amounts set forth in the settlement statement appended hereto as **Exhibit F**, at the closing of the Sale with the limited exception of (1) all fees due the Office of the United States Trustee, (2) the commission due the Debtor's broker, and (3) fees and expenses due the Debtor's counsel, Zeisler & Zeisler, P.C. (collectively, the "Net Proceeds"). The Debtor proposes its counsel holding after the closing on the Sale the Net Proceeds in its IOLTA account in trust for the Debtor until further order of this Court (e.g., approving the fees due the broker and the fees and expenses due the Debtor's counsel).

17

68.    The Debtor does not anticipate any further administrative expenses other than those that may be satisfied with the Net Proceeds of the Sale.

69.    All amounts stated in the settlement statement appended hereto as **Exhibit F** and concerning anticipated administrative expenses represent the Debtor's best estimate based upon information in its possession and information provided to it by the corresponding creditors. These amounts may change as further information is obtained and are subject to the approval of this Court pursuant to this Sale Motion.

### Creditor Contact List

70.    The only identified unsecured creditor is United Illuminating Company ("UI"). The Debtor does not believe it owes any balance to UI but listed it as a creditor in an abundance of caution to ensure proper notice so UI may protect whatever interest it claims.  UI may be contacted as follows:

> United Illuminating Co.
> Attn: Pres., GP. Or Mng. Mbr.
> 100 Marsh Hill Rd.
> Orange, CT 06477

### The Bidding Procedures

71.    The Debtor crafted the Bidding Procedures to permit an expedited sale process necessitated by the circumstances faced by the Debtor, while simultaneously fostering an orderly, fair and competitive sale process that will confirm that Blue Garden's bid is the highest and best bid for the Debtor's Property or promptly identify any other higher and better alternatives.  The Bidding Procedures are set forth in detail in **Exhibit 1** to the Bidding Procedures Order annexed hereto as **Exhibit B**.  CREDITORS AND PARTIES IN INTEREST ARE URGED TO REVIEW **EXHIBIT 1** TO THE BIDDING PROCEDURES ORDER FOR FURTHER DETAILS CONCERNING THE PROPOSED BIDDING PROCEDURES.  DESCRIPTIONS OF THE

BIDDING PROCEDURES IN THIS MOTION ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO **EXHIBIT 1** ITSELF.   The following constitute the proposed Bidding Procedures:

### Bid Procedures

Set forth below are the bid procedures (the "Bid Procedures") to be employed with respect to the sale of those certain pieces and parcels of real property known as 540 Bond Street a/k/a 600 Bond Street and 735 Palisade Avenue, Bridgeport, Connecticut, and all improvements, fixtures and personal property situated thereon (the "Property") owned by Bridgeport Health Care Realty Co. (the "Debtor"), in its chapter 11 bankruptcy case (the "Chapter 11 Case") pending in the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"), Case No. 21-50521(JAM).

The Debtor proposes to sell and transfer the Property (the "Sale Transaction") to the stalking horse bidder, Blue Garden Management, Inc. ("Buyer"), for the aggregate purchase price (the "Purchase Price") set forth in that certain Purchase and Sale Agreement, made as of August 17, 2021, by and among Buyer and the Debtor (the "PSA").  The Sale Transaction pursuant to the PSA is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Participation Requirements

Any person desiring to submit a bid for all or part of the Debtor's Property (a "Potential Bidder") will be required to deliver (unless previously delivered) to the Debtor, on or before the Bid Deadline (as defined below), the following in addition to the other materials required hereby (collectively, the "Participation Requirements"):

(1) an executed confidentiality agreement in form and substance satisfactory to the Debtor; and

(2) satisfactory written evidence of available funds or a firm, irrevocable and unconditional commitment for financing sufficient for the Potential Bidder to consummate the Sale Transaction.

The financial information and credit-quality support of any Potential Bidder must demonstrate the financial capability of the Potential Bidder to timely consummate the Sale Transaction pursuant to a Qualified Bid (as defined below).

### Due Diligence

The Debtor will afford any Potential Bidder who satisfies the Participation Requirements such due diligence access or additional information as the Debtor, in its business judgment, determine to be reasonable and appropriate; provided, however, that the same access and

information must also be made available to the Buyer. Interested parties requesting information about the qualification process and Qualified Bidders (as defined below) requesting information in connection with their due diligence should contact:

> Mr. Levi Judkin
> Brass Moon Realty
> 211 Chase Avenue
> Waterbury CT 06704
> Telephone: (203) 724-7127
> Email: leviyudkin@gmail.com

### Bid Deadline

A Potential Bidder that desires to make a bid must deliver written copies of its bid by email to the following parties so as to be received no later than 2:00 p.m. (prevailing Eastern Time) on September __, 2021 (the "Bid Deadline"): (a) counsel for the Debtor, Zeisler & Zeisler, 10 Middle Street, 15th Floor, Bridgeport CT 06604 (Attn: Stephen M. Kindseth (skindseth@zeislaw.com)); (b) counsel for People's United Bank, National Association, Cohn Birnbaum & Shea, P.C., 100 Pearl Street, Hartford, CT 06103 (Attn: Scott D. Rosen (srosen@cbshealaw.com)); and (c) the Office of the United States Trustee, Giaimo Federal Building, 150 Court Street, Room 302, New Haven, CT  06510 (Attn: Steven E. Mackey (Steven.E.Mackey@usdoj.gov)).

### Bid Requirements

Each bid must be a written offer from a Potential Bidder, not contingent on any event not provided for in the PSA, including any due diligence investigation, receipt of financing or receipt of further approvals (other than customary regulatory approvals), that (1) is received in accordance with the time deadlines and in the form provided for herein; (2) offers to consummate the Sale Transaction on terms no less favorable to the Debtor than those set forth in the PSA; (3) includes a marked copy of the PSA to show any proposed amendments thereto (a "Modified PSA") and a clean and executed Modified PSA; (4) includes a statement that there are no conditions precedent to the Potential Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid; (5) states that such offer is binding and irrevocable until the consummation of the Sale Transaction; (6) offers to pay a purchase price that is at least $100,000 greater than the purchase price contained in the PSA plus the Break-Up Fee (as defined below), and otherwise on terms at least as favorable to Debtor as those set forth in the PSA (the "Initial Bid Increment"); provided, further, that after such Initial Bid Increment, all further overbids must be in increments of at least $50,000; (7) discloses the identity of each entity that will be bidding or otherwise participating or investing in connection with such bid including their affiliates, and the complete terms of any such participation; (8) includes the names and contact information of members of the Potential Bidder who will be available to answer questions regarding the offer; (9) includes the names of the Potential Bidder's external advisors including financial, legal and accounting firms, as well as industry consultants or other resources; (10) contains all other information reasonably requested by the Debtor and People's United; and (11) provides a statement acknowledging that the Potential Bidder (other than the Buyer) is not entitled to any break-up fee, termination fee, expense reimbursement or similar payment.

The Debtor will consider all bids submitted whether or not they conform to the form set forth in the PSA and will consider bids for less than all of the assets proposed to be sold under the PSA; provided, however, following the date of the Sale Hearing, and only if the PSA is approved by the Bankruptcy Court, the Debtor will not participate in any discussions with, or furnish any information to, any person or entity with respect to any alternative transaction regardless of the terms thereof. Should any overbidding take place as set forth herein, the Buyer shall have the right, but not the obligation, to participate in the overbidding and to be approved as the Successful Bidder at the Sale Hearing based upon any such overbid.

Additionally, bids must be accompanied by (1) a wire transfer to the Debtor of an amount in immediately available funds equal to at least $250,000 (the "Good Faith Deposit"), and (2) written evidence of available cash or a firm, irrevocable and unconditional commitment for financing and such other evidence of ability to consummate the transaction as the Debtor may reasonably request. To the extent any Potential Bidder proposes to include non-cash consideration in its bid, such non-cash consideration must be freely marketable and such bid must be accompanied by the form of note or other type of instrument in connection with such non-cash consideration.

## Qualified Bids and Bidders

A bid received from a Potential Bidder that meets the requirements set forth in the preceding three paragraphs will be considered a "Qualified Bid" and a Potential Bidder making a Qualified Bid who has also satisfied the Participation Requirements will be deemed a "Qualified Bidder." The PSA is a Qualified Bid and the Buyer is a Qualified Bidder for all purposes and requirements of these Bid Procedures at all times.

The Good Faith Deposits of all Qualified Bidders shall be held by the Debtor in a separate account for the Debtor's benefit. If a Successful Bidder fails to consummate an approved sale of the Assets because of a breach or a failure to perform on the part of such Successful Bidder, such Successful Bidder's Good Faith Deposit will be forfeited to the Debtor as provided for in the PSA.

## Auction Participation

Unless otherwise agreed to by the Debtor, only the Debtor, People's United, the US Trustee and Qualified Bidders, and their respective legal or financial professionals, are eligible to attend or participate at the Auction. Subject to the other provisions of these Bid Procedures, if the Debtor does not receive any Qualified Bids other than the Qualified Bid made by the Buyer in the PSA, the Debtor will not hold the Auction and the Buyer will be named the Successful Bidder.

## Auction

If more than one Qualified Bid has been received by the Bid Deadline, the Debtor will conduct an auction (the "Auction") for the sale of all or substantially all of the Debtor' assets. Each Qualified Bidder will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale Transaction. Prior to the Auction, the Debtor will select, in its reasonable discretion following prior consultation with People's United and the US Trustee, the

Qualified Bid that represents the then-highest or otherwise best value to the Debtor (the "Baseline Bid") to serve as the starting point for the Auction.

The Auction shall take place at 10:00 a.m. (prevailing Eastern Time) on September __, 2021, at the offices of Zeisler & Zeisler, P.C., 10 Middle Street, 15th Floor, Bridgeport CT 06604. If the Auction cannot take place in person due to COVID-19 coronavirus related restrictions, the Debtor shall make arrangements to conduct the Auction remotely and the Debtor shall ensure that the Auction is properly recorded and results of the Auction transcribed.  At the Auction, only the Buyer and other Qualified Bidders will be permitted to increase their bids or make any subsequent bids.  The bidding will start at the purchase price and terms proposed in the Baseline Bid and after the Initial Bid Increment will continue in increments of at least $50,000 in cash or cash equivalents. Qualified Bidders may participate in person or by representative.  The Auction shall be transcribed by a qualified court reporter.

Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction and such other information as the Debtor reasonably determines is relevant, the Debtor may conduct the Auction in the manner it reasonably determines, in its business judgment and following consultation with People's United and the US Trustee, will promote the goals of the bid process, will achieve the maximum value for all parties in interest and is not inconsistent with any of the provisions of these Bid Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith. Such rules will provide that (1) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder; (2) all bids will be made and received in one room (in person or electronic in the case of a remote auction), on an open basis, and all other Qualified Bidders will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder will be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; and (3) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction. Notwithstanding anything contained in these Bid Procedures, the Debtor may modify or waive any provisions of these Bid Procedures at the Auction if, in its reasonable judgment following consultation with People's United and the US Trustee, such modification or waiver will better promote the goals of the Auction.

The Auction shall continue until there is only one offer that the Debtor determines, following consultation with People's United and the US Trustee and subject to Bankruptcy Court approval, is the highest or best offer from among the Qualified Bidders (including the Buyer) submitted at Auction. In making this decision, the Debtor may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the PSA requested by each Qualified Bidder, and the net benefit to the Debtor's estate (the "Successful Bid").  The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of the "Purchaser" as set forth in the PSA or the Modified PSA, as applicable.

Immediately prior to the conclusion of the Auction, the Debtor shall (1) review each bid made at the Auction on the basis of financial and contractual terms and such other factors as may be relevant to the sale process, including those factors affecting the speed and certainty of

consummating the Sale Transaction; (2) identify the Successful Bid; and (3) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name or names of the Successful Bidder and the amount and other material terms of the Successful Bid.

All bidders at the Auction shall be deemed to have consented to these Bid Procedures and to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction and the construction and enforcement of the PSA.

To the extent that there is any disagreement or dispute at the Auction that cannot be resolved among the Debtor, People's United, the US Trustee and the Qualified Bidders, the Debtor shall stop the Auction and immediately contact the Court to seek to have the Court resolve such disagreement or dispute.

### Acceptance of Qualified Bids

The Debtor presently intends to sell the Property to the Qualified Bidder that submits the highest and best bid. The Debtor's presentation to the Bankruptcy Court for approval of any Successful Bid does not constitute the Debtor's acceptance of such bid. The Debtor will be deemed to have accepted a bid only when it has been approved by the Bankruptcy Court at the Sale Hearing (defined below). After conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities.

### Sale Hearing

The Debtor will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to begin on September __, 2021 at __:00 _.m. (prevailing Eastern Time), to approve and authorize the Sale Transaction to the Successful Bidder on terms and conditions determined in accordance with the Bid Procedures.

### Break-Up Fee

In the event that the PSA is terminated under the circumstances described in the PSA, to the extent approved in the order approving these Bid Procedures, the Debtor shall pay the Buyer a break-up fee of $100,000 (the "Break-Up Fee") as, when and to the extent provided in the PSA.

The Debtor's obligation to pay the Break-Up Fee shall survive the termination of the PSA, dismissal or conversion of the Bankruptcy Case, and confirmation of any plan of reorganization or liquidation, including the Plan, and shall constitute a super-priority administrative expense of the Debtor under section 503(b) and 507(a) of the Bankruptcy Code to the extent so provided in the PSA.

### No Entitlement to Fees for Potential Bidders or Qualified Bidders

Neither the tendering of a bid nor the determination that a bid is a Qualified Bid shall entitle a Potential Bidder or a Qualified Bidder to any break-up, termination or similar fee and all Potential Bidders and Qualified Bidders waive any right to seek a claim for substantial contribution.

**Back-Up Bidder and Return of Good Faith Deposit**

If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid (including the Buyer) after that of the Successful Bidder, as determined by the Debtor in the exercise of their business judgment after prior consultation with People's United and the US Trustee, at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until one (1) business day after the closing of the Sale Transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtor will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court.

Except as otherwise provided herein or in the PSA, Good Faith Deposits shall be returned to each bidder not selected by the Debtor as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the Sale Hearing. The Good Faith Deposit of the Back-Up Bidder shall be returned within five (5) business days after the closing the sale between the Debtor and the Successful Bidder.

72.     As part of the Bidding Procedure, the Debtor is seeking approval of the provisions of the PSA regarding the payment to Blue Garden of a break-up fee of $100,000, which would be paid to Blue Garden if, among other things, this Court enters an order selecting a successful bidder other than the Blue Garden.

**Approval of the Bidding Procedures, Bidder Protection and the PSA**

73.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Flour City Bagels, LLC, 557 B.R. 53, 78 (Bankr. W.D.N.Y. 2016) (noting that "[i]n conducting an auction sale, debtor have a fiduciary duty to maximize the value of their assets."). To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. See In re 310 Associates, 346 F.3d 31, 34 (2d Cir. 2003); Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992). In overseeing an asset sale subject to an auction process, the bankruptcy court,

walks a tightrope between, on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate.

In re Fin. News Network, Inc., 980 F.2d 165, 166 (2d Cir. 1992). Because the court must perform this difficult balancing act, "a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed" that "reduce the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it." Id. at 169-70. In particular, courts have found that bidding incentives such as the Break-Up Fee encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. See, e.g., In re S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995) (stating that "[a]greements to provide break-up fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); In re Integrated Resources. Inc., 147 B.R. at 660 (S.D.N.Y. 1992) (noting that break-up fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs, and the risks such bidder faces by having its offer held open, subject to higher and better offers).

74.     Here, the Debtor submits that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this Circuit, and in the best interest of the Debtor's estate. The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the net value realized from the sale by this estate. In particular, the Bidding Procedures contemplate an open auction process and provide potential

bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

75.    The Bidding Procedures provide the Debtor with an adequate opportunity to consider competing bids and select the highest and best offer for the completion of the Sale. Entering into the PSA with Blue Garden ensures the Debtor obtain fair market value by setting a minimum purchase price that will be tested in the marketplace.    As such, the Debtor and its creditors can be assured that, taking into account the financial condition of the Debtor and the economy, the consideration obtained will be fair and reasonable and at or above market.

76.    The Break-Up Fee represents 2% of the total value to the Debtor of the Sale under the PSA.  The Break -Up Fee is payable upon the occurrence of certain "triggering events" typical and customary for transactions of this kind.    Bankruptcy courts in this Circuit analyze the appropriateness of bidding incentives such as these under the "business judgment rule" standard, and it is well-established in this Circuit that courts consider whether: (a) the relationship of the parties who negotiated the break-up fee was tainted by self-dealing or manipulation; (b) the fee hampers, rather than encourages, bidding; and (c) the amount of the fee is unreasonable relative to the proposed purchase price.  See, e.g., In re Genco Shipping & Trading Limited, 509 B.R. 455, 465 (Bankr. S.D.N.Y 2014); In re Integrated Res., 147 B.R. at 657-664.  The Debtor submit that the Break-Up Fee is appropriate under each of the three foregoing factors.  First, the Break-Up Fee is the product of good faith, arm's-length negotiations between Blue Garden and the Debtor, who was acting not in its own self-interest, but rather, in the interest of the bankruptcy estates consistent with its fiduciary duties.  Second, the Debtor believes, based on its reasoned business judgment, that the presence of the Break-Up Fee enhances its ability to maximize value without chilling bidding.  The Break-Up Fee was a material inducement for, and a condition of, Blue Garden's

agreement to enter into the PSA. Third, the Debtor believes, based on its reasoned business judgment, that the Break-Up Fee is reasonable and appropriate relative to the size, nature, and complexity of this transaction and the commitments made and resources expended by Blue Garden in connection therewith in view of the meaningful floor established by the PSA for competitive bidding; the substantial benefits already received by the Debtor and its estate from having a stalking horse bid serve as a catalyst for other potential or actual bidders to confirm that the Debtor receive the highest and best offer by subjecting the sale to an open auction and competitive bidding; the need of the Debtor to move forward with a transaction with a high likelihood of closure assured by a contractually committed party at a fair and reasonable price consistent with the timeline of this Chapter 11 Case; and the risks borne by Blue Garden for being the stalking horse in this transaction and any opportunity costs incurred as a result thereof. See In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking."). Accordingly, the Debtor respectfully submit that the Break-Up Fee reflects a sound business purpose, is fair and appropriate under the circumstances, and should be approved.

77.     The PSA is the result of arms-length negotiations, is fair to the Debtor, Blue Garden or any other proposed buyer, and creditors and other parties in interest, and includes provisions that are common and customary for such transactions. The Debtor has determined, in the exercise of its business judgment and in the context of the financial difficulties it faces, that entering into and selling substantially all of its assets pursuant to the PSA is in the best interests of the Debtor and its creditors. The Debtor requests that this Court approve the form and provisions of the PSA as fair and reasonable. The PSA shall, however, be subject to higher and better bids at the Auction

to be held and to further order of this Court authorizing the sale of the Debtor's Property pursuant to this motion.  The Debtor needs an approved form of PSA to market its assets in a meaningful way.  The Debtor must be able to inform other bidders of the specifics of Blue Garden's offer and what form of agreement has been entered into by the Debtor and approved by this Court, so that bidders may formulate their bids with the provisions of Blue Garden's offer in mind.

78.    Pursuant to Bankruptcy Rules 2002(a) and 6004, the Debtor is required to give 21 days' notice of any proposed sale of property not in the ordinary course of business.  Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, the terms and conditions of the sale, and the time fixed for filing objections to the sale.  The Notice of Auction and Sale appended as **<u>Exhibit 2</u>** to the proposed Bidding Procedures Order sets forth all the information a potential bidder and any other party in interest should require about the bidding process, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the bid deadline; the time, date, and location of the Auction; and the time, date, and location of the Sale Hearing.   The Debtor submits that the notice procedures described above fully comply with Bankruptcy Rule 2002, and constitute good and adequate notice as such procedures are reasonably calculated to provide timely and adequate notice of the Sale, Bidding Procedures, Auction, and Sale Hearing to the Debtor's creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Property. Accordingly, the Debtor respectfully requests that this Court approve the notice procedures set forth in this motion, including the form and manner of service and publication of the Notice of Auction and Sale, and that no other or further notice of the Bidding Procedures or Auction is necessary or required.

## Sale Approval

79.    The Debtor seeks this Court's authority to sell the Property (which constitutes substantially all of its assets) free and clear of certain liens, interests and encumbrances to Blue Garden or to such other entity or entities constituting a "Qualified Bidder" and submitting a Bid deemed by this Court to be the highest and best offer for the Debtor assets.  Bankruptcy Code § 363(b) provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…."  A court may authorize the sale of all or a substantial portion of a Chapter 11 debtor's assets pursuant to Bankruptcy Code section 363 prior to approval of a plan where the debtor provides an articulated business justification for such a sale. Committee of Equity Security Holders v. The Lionel Corporation (In re The Lionel Corporation), 722 F.2d 1063, 1070 (2nd Cir. 1983).  In determining whether there is such an articulated business justification, a court may consider all salient factors pertaining to the proposed sale, including the proportionate value of the asset to the estate as a whole, the likelihood that a plan will be proposed and confirmed, the effect of the proposed sale on the debtor's ability to file a plan, the proceeds to be obtained from the disposition relative to the value of the property, and whether the assets are increasing or decreasing in value.

80.    The Debtor submits that the proposed sale of the Property satisfies the standards set forth by the Second Circuit for the sale of substantially all of a debtor's assets outside of a plan of reorganization. Further, the Debtor submits that the proposed sale will maximize the value obtained for the Property. The purchase price agreed to be paid by Blue Garden is nearly $1 million more than the recently appraised value of the Property. In addition, the sale to Blue Garden is subject to the Bidding Procedures Order, which sets forth a procedure for obtaining higher and

better offers subject to bidding guidelines designed to maximize and obtain the highest value for the Debtor's estate.

81.    The Debtor believes that any alternative to the proposed Sale will be virtually impossible. The Debtor has no operating business and possesses no cash resources. The subject Property is vacant and boarded up, but the Debtor continue to accrue various liabilities for real estate taxes and other municipal charges having priority over the mortgage held by People's United.  In the absence of this Sale, a foreclosure sale will likely be rescheduled in the WPCA Foreclosure Action (after the WPCA obtain relief from the automatic stay) which foreclosure sale almost certainly will realize far less than the Sale proposed herein.

82.    All of the foregoing weighs heavily in favor of this Court approving the Sale of substantially all of the Debtor' assets pursuant to this motion.

83.    Bankruptcy Code section 363(m) provides: "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."   While the Bankruptcy Code does not define "good faith," courts have found that

> [t]he requirement that a purchaser act in good faith. . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

In re Andy Frain Services. Inc., 798 F .2d 1113, 1125 (7th Cir. 1986) (emphasis omitted), quoting In re Rock Indus. Mach. Com., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of § 363 (m)).

84.    As set forth above, the PSA is the result of arms-length negotiations and was not tainted by fraud, collusion, or bad faith.  The PSA will benefit all parties in interest including the City of Bridgeport, various other municipal authorities, People's United, as well as the community in which the Property is located. Accordingly, the Debtor request that this Court make a finding that the proposed purchase is entitled to the protections of Bankruptcy Code § 363(m).

85.    Bankruptcy Code § 363(f) provides, among other things, that a debtor may sell property free and clear of any interest in such property if (1) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; (2) the holder of such interest consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) the interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

86.    The Debtor submits that any party holding liens in the Property proposed to be sold by this motion could be compelled to accept a monetary satisfaction of such interests pursuant to section 363(f)(5). See, e.g., Barnes v. Barnes (In re Barnes), 2020 Bankr. LEXIS 991, *12-13 (Bankr. D. Conn. 2020); Barnes v. Barnes (In re Barnes), 2019 Bankr. LEXIS 3839, *12 (Bankr. D. Conn. 2019) ("[T]he satisfaction of § 363(f)(5) may well be achieved in a Rhode Island foreclosure or in a Chapter 11 cramdown."); In re Gulf States Steel, 285 B.R. 497, 509 (Bankr. N.D. Ala. 2002) ("Section 365(f)(5) does not require that the sale price for the Property must exceed the value of the interests, but rather, only that the mechanism exists to address extinguishing the lien or interest without paying such interest in full. … Even if an actual payment were required, the lienholder would only be entitled to receive what it would receive in the event of a cram-down."); In re Healthco Int'l, Inc., 174 B.R., 177 (Bankr. D. Mass. 1994).

87.     In addition, where the purchase price for a debtor's assets is the best available under the circumstances, a court may authorize the sale free and clear of existing liens, claims and encumbrances pursuant to section 363(f)(3) even if the purchase price is less that the face amount of the liens, claims and encumbrances.  See, e.g., In re Boston Generating, LLC, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010) ("[S]ection 363(f)(3) should be interpreted to mean that 'the price must be equal to or greater than the aggregate *value* of the liens asserted against it, not their *amount*.'" (citation omitted, emphasis in original)).  In the facts and circumstances presented here, with the procedures outlined herein, the Debtor's prior efforts to market the Property, and the appraised value of the Property, the Debtor believes that the purchase price achieved is the best available.

88.     Finally, with respect to Caretech, for the reasons set forth above, its lien and interest in the Property is subject to a bona fide dispute.  *See* 11 U.S.C. § 363(f)(4).

89.     Accordingly, this Court should authorize the Sale proposed herein free and clear of any liens, claims, encumbrances or interests, regardless of their face amount.

**WHEREFORE**, for the foregoing reasons, the Debtor request that this Court grant the relief requested herein and grant such other and further relief as this Court deems just and proper.

Dated at Bridgeport, CT, the 23rd day of August, 2021.

BRIDGEPORT HEALTH CARE REALTY CO.,
THE DEBTOR


By:    */s/ Stephen M. Kindseth*
Stephen M. Kindseth (Federal Bar No. ct14640)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06605
Tel. 203-368-4234
Fax 203-368-5487
Email: skindseth@zeislaw.com
Its Attorneys